IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BERNARD CAMPBELL, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-19-1173 |
| ASRESAHEGN GETACHEW, M.D., | * | |
| WEXFORD HEALTH SOURCES, INC., | | |
| and JANETTE CLARK, N.P., | * | |
| Defendants. | * | |

\*\*\*

<u>**MEMORANDUM OPINION**</u>

THIS MATTER is before the Court on Defendants Asresahegn Getachew, M.D., Wexford Health Sources, Inc., and Janette Clark, N.P.'s Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 29) and Defendant Getachew's Motion to Dismiss or, Alternatively, for Summary Judgment[1] (ECF No. 31).[2] The Motions are ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2018). For the

---

[1] The contracted medical care provider for the Maryland Division of Correction facilities changed from Wexford Health Source, Inc., to Corizon, which holds the contract as of January 1, 2019. Counsel for Getachew filed the second motion on his behalf for the period beginning January 1, 2019. (<u>See</u> ECF No. 31-2 at 1 n.1).

[2] Also pending before the Court are Plaintiff Bernard Campbell's Motions for Summary Judgment (ECF No. 37, 52) and Motion for Dental Records (ECF No. 44), as well as several Motions to Strike by Getachew (ECF Nos. 38, 49, 54). For the reasons explained below, Campbell's Motions for Summary Judgment will be denied; Campbell's Motion for Dental Records will be denied without prejudice; Getachew's First Motion to Strike (ECF No. 38) will be granted in part and denied in part; and Getachew's Second and Third Motions to Strike (ECF Nos. 49, 54) will be granted.

reasons outlined below, the Court will grant in part and deny in part Defendants' Motions, which the Court construes as motions for summary judgment.

## I.    BACKGROUND

A.    **Campbell's Allegations**[3]

Plaintiff Bernard Campbell is an inmate at Western Correctional Institution ("WCI") in Cumberland, Maryland. (Compl. at 1, ECF No. 1). He suffers from a hereditary, incurable disease known as Charcot-Marie-Tooth ("CMT").[4] (May 10, 2019 Supp. ["1st Supp."] at 3, ECF No. 3; Defs.' Mot. Dismiss Alt. Summ. J. ["Defs.' Mot. Dismiss"] Ex. 1 ["Med. Recs."] at 2, ECF No. 29-4). Campbell's CMT, which causes him severe pain and loss of mobility in his legs, feet, hands, and arms, is "progressively [] getting worse." (1st Supp. at 3).

Campbell requires the use of leg braces to assist him with standing. (Med. Recs. at 45). He states that on February 10, 2018, he was seen by Defendant Asresahegn Getachew, M.D., who placed an order for Campbell to be fitted with new ankle foot orthotics

---

[3] Unless otherwise noted, the Court takes the following facts from Campbell's Complaint and Supplemental Complaints (ECF Nos. 1, 3, 8) and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted). Pro se complaints are entitled to special care to determine whether any possible set of facts would entitle the plaintiff to relief. Hughes v. Rowe, 449 U.S. 5, 9–10 (1980).

[4] CMT is a progressive peripheral neuropathy that involves loss of muscle bulk in legs and feet, frequent tripping and falling, pain due to muscle cramps or nerve damage, and difficulty walking. See Mayo Clinic, Charcot-Marie-Tooth disease, https://www.mayoclinic.org/diseases-conditions/charcot-marie-tooth-disease/symptoms-causes/syc-20350517 (last visited Aug. 31, 2020). Treatment generally includes prescription pain medication, physical therapy, occupational therapy, and orthopedic devices to assist with mobility and to prevent injury. (Id.). The disease generally begins in the feet and lower extremities but may eventually affect an individual's hands and arms. (Id.).

("AFOs"). (1st Supp. at 3). Campbell explains he has a bilateral foot-drop[5] and the leg braces help him with standing and in preventing falls. (Id.).

On August 21, 2018, Campbell was sent offsite to be measured and fitted for new leg braces. (Id.). He claims that the "medical staff at WCI did not want to pay for the AFOs so they order[ed] a different kind of brace," which Campbell received on November 8, 2018. (Id.). According to Campbell, the leg braces provided did not work and Mary Miller told him on January 16, 2019, that he would need to submit another consult request to obtain new AFO braces. (Id.). WCI approved his consult request on March 31, 2019, but had not provided him with the braces as of April 8, 2019. (Id. at 3–4).

Campbell also requires a long-handled toothbrush as an assistive device because he has "very weak fingers and weak hands." (Id. at 4). On June 22, 2018, Clark saw him and gave him "medical paperwork" to have a long-handled toothbrush. (Id.). Campbell complains that while property officer Lt. Pennington gave him a long-handled toothbrush "last year"—apparently referring to 2018—he had not received a new one. (Id.). When Campbell complained about not receiving a new toothbrush, he was told by Lt. Pennington that he would receive a new toothbrush when he requested one. (Id.). Campbell states he requested a new toothbrush in February 2019, but Lt. Pennington responded that it was a medical issue and medical staff was supposed to provide him with this toothbrush. (Id. at

---

[5] A foot drop refers to "difficulty lifting the front part of the foot" causing the front of the foot to drag on the ground when walking. It is a sign of an underlying neurological, muscular or anatomical problem. See Mayo Clinic, Foot Drop, https://www.mayoclinic.org/diseases-conditions/foot-drop/symptoms-causes/syc-20372628 (last visited Aug. 31, 2020).

5). Campbell claims that he was informed during a dental check-up on April 29, 2019, that he had two cavities, which he asserts were caused by his lack of a new toothbrush. (Id.).

Campbell also claims that his pain medications were improperly discontinued and he was improperly denied a personal wheelchair. (June 20, 2019 Supp. ["2d Supp."] at 1, ECF No. 8). He states that on November 28, 2018, he went to Bon Secours Hospital ("BSH") for an Electromyography ("EMG") study.[6] (Id.). The neurologist he saw, Dr. Harjit Bajaj, wrote an order to continue Campbell on his current medications. (Id.). Campbell's medications at that time included Ultram, a narcotic strength pain reliever. (Id.). On December 1, 2018, the "Pain Management Clinic . . . took [Campbell] off the Ultram medication" despite Bajaj's order. (Id.). The medication was not reinstated until June 7, 2019, and it was prescribed at a lower dose. (Id.). The five-month interruption in pain medication caused Campbell to suffer "a lot of pain days and nights." (Id.). He states that all medical providers agree that his condition is worsening, yet his "medication ke[pt] getting tak[en] from [him]." (Id.).

Campbell describes his inability to obtain a personal wheelchair as an ongoing problem. (Id.). He explains that he has "very bad drop foot" in both feet and requires leg braces on both legs; but for long distances he has been provided a wheelchair since November 19, 2012. (Id.). He states that he had been requesting his own wheelchair for

---

[6] An EMG is "a diagnostic procedure to assess the health of muscles and the nerve cells that control them[.]" See Mayo Clinic, Electromyography (EMG), https://www.mayoclinic.org/tests-procedures/emg/about/pac-20393913 (last visited Aug. 31, 2020). The test results can reveal "nerve dysfunction, muscle dysfunction or problems with nerve-to-muscle signal transmission."

use in his cell since August 8, 2015, because he has suffered several falls that have resulted in injuries. (Id. at 1–2).

On July 3, 2017, Campbell fell while he was in his cell and sustained a fracture to his pinky finger. (Id. at 2). Campbell's records indicate his chronic medical conditions include "mallet finger"[7] in the fifth finger on his right hand. (Med. Recs. at 18). Campbell was "seen by [a] hand surgeon" on September 19, 2017 for this condition, resulting in a recommendation for splinting. (Id.).

On March 8, 2019, Campbell fell while in the recreation hall of his housing unit. (2d Supp. at 2). On May 24, 2019, Campbell fell again while in his cell and reinjured the finger he fractured in 2017. (Id.). Campbell states he has been asking for an x-ray of his hand because he believes he fractured his finger again. (Id.).

On June 13, 2019, Campbell met with "a nurse name[d] Ryan" and a "lady who works in medical" named Brenda Reese to discuss an administrative remedy procedure complaint ("ARP") regarding his need for a wheelchair. (Id. at 2). They told him that Bajaj issued an order for a wheelchair on May 22, 2019; however, as of June 20, 2019, Campbell had not received a wheelchair. (Id.).

---

[7] Mallet finger occurs "when the outermost joint of the finger is injured" and can occur when a fracture causes the tendon to rupture. See WebMD, Mallet Finger, https://www.webmd.com/fitness-exercise/mallet-finger#1 (last visited Aug. 31, 2020). The condition can cause an "[i]nability to completely extend the finger while still being able to move it with help." Id.

**B.**     **Defendants' Response**

On February 10, 2018, Campbell was seen by Getachew for a Chronic Care Visit. (Med. Recs. at 2). Getachew noted that Campbell's CMT was "getting worse" and referred Campbell for a neurology consultation. (Id.). At that time, Campbell was prescribed Tramadol 100 mg twice a day and Neurontin 1800 mg twice a day. (Id. at 3). In Getachew's assessment and plan he noted that Campbell's current medications should be continued "since the patient reported his pain is well controlled when he is on Neurontin and Ultram." (Id. at 5).

On April 10, 2018, Terri Davis, P.A., saw Campbell for a sick call request. (Id. at 6–8). Davis reordered Campbell's Ultram and completed paperwork prescribing Campbell wheelchair use for long distances as well as for assignment to a handicapped cell. (Id. at 6, 8).

On May 31, 2018, Campbell was seen by Matthew Carpenter, P.A. for sick call regarding a request for renewal of his pain medication. (Id. at 9). Campbell told Carpenter that his leg braces no longer fit properly and he was almost out of straps for the braces. (Id.). A consultation for a fitting for new braces at University of Maryland was pending at the time. (Id.). Carpenter did not renew Campbell's prescriptions for Tramadol and Ultram, noting potential for abuse, increased tolerance, and physical dependence associated with opioids. (Id.). Carpenter also noted that Campbell did not appear to be in pain during the sick call visit. (Id.). Campbell's prescription for Neurontin was refilled. (Id. at 11). Carpenter also submitted another referral for Campbell to be fitted with new leg braces. (Id. at 12).

Campbell was seen by Bajaj at BSH on June 6, 2018. (Id. at 13–14). Bajaj noted that Campbell reported being unable to sleep through the night due to the pain he experiences. (Id.). Campbell reported that "he has been taking the medications for symptomatic treatment for his neuropathy, including tramadol and Neurontin, but he said symptoms are worsening. Now in the nighttime, he cannot sleep because symptoms are so severe . . . he has tingling and numbness in both feet up to both knees." (Id. at 13). Campbell also reported that he was developing tingling and numbness in both hands. (Id.). Bajaj noted that Campbell was "already on Ultram 150 mg b.i.d., Neurontin 1800 mg b.i.d.," which Bajaj characterized as a "very high dosage of these medications." (Id. at 14). To address Campbell's increasing pain, Bajaj added "Elavil 60 mg every night" to help with both the neuropathy and the insomnia. (Id.).

On June 8, 2018, Getachew entered an administrative note indicating that he was informed by a nurse that Campbell was "about to run out of his Ultram." (Id. at 16). Getachew noted he would renew Campbell's medication and re-evaluate him in two weeks. (Id.).

On June 22, 2018, Clark saw Campbell for sick call regarding his request for a long-handled toothbrush to accommodate his hand weakness. (Id. at 18). According to Getachew, Campbell's request for the long-handled toothbrush was not approved by security because it was deemed to be "susceptible to being weaponized." (Defs.' Mot. Dismiss Ex. 5 ["Getachew Decl."] ¶ 8, ECF No. 29-5). This disapproval occurred twice; Getachew avers that there is a plan for Campbell's healthcare providers to meet to consider an alternative solution for his oral hygiene. (Id.).

On July 21, 2018, Beverly McLaughlin, R.N.P., advised Campbell he had been approved for an evaluation for new leg braces and should be scheduled soon. (Med. Recs. at 22). On August 21, 2018, Campbell was seen at Ability Prosthetics and Orthotics ("Ability") in Hagerstown, Maryland. (Id. at 24). The patient notes from the evaluation indicate that Campbell had been using his current AFOs for three years and they "are cracking and the pads and straps are worn out." (Id.). The notes also indicate that the new braces would need to be "a custom version due to his thin leg size which is not accommodated very well by the prefabricated options." (Id.). On October 3, 2018, Campbell was informed by Mary Miller, N.P., that "per collegial decision" the custom orthotics he was evaluated for would not be ordered until Campbell "tried braces ordered on site to see if they were beneficial." (Id. at 30). Campbell was "initially upset but after discussing it with him he agreed to try the orthoses/braces ordered on site." (Id.).

On September 18, 2018, when Campbell was seen by Miller, she noted that Campbell was "[c]urrently on Neurontin and tramadol." (Id. at 26). Campbell told Miller that he suffers from "diffuse generalized pain, worse in his bilateral lower legs and feet," with worsening symptoms in his hands. (Id.). Miller renewed Campbell's medications and noted that the EMG consultation request from July 12, 2018 was still pending and the status needed to be checked. (Id. at 26, 29).

Campbell began complaining of a loss of his sense of smell and taste at an October 3, 2018 visit with Miller. (Id. at 30). Campbell brought this problem up again with Miller on October 28, 2018. (Id. at 33). Miller noted that Campbell was started on Zyrtec for his allergies at the last scheduled appointment, but Campbell explained it only helped with the

allergies and not the decrease in smell and taste. (Id.). When Campbell expressed concerns about cancer causing his symptoms, Miller explained that the loss of taste and smell can be caused by "several other possible causes such as nasal polyps, zinc deficiency, etc." (Id.). Miller ordered lab tests to rule out other possible causes such as diabetes and Sjogren's syndrome, an immune system disorder. (Id. at 33, 36). Miller also noted that Campbell had suffered a traumatic brain hemorrhage in 1997. (Id. at 33).

On November 29, 2018, Bajaj conducted an EMG test on Campbell. (Id. at 40). Campbell met later that day with Karen Glass, R.N., who noted that Bajaj had issued orders for Campbell to continue with Tramadol, Neurontin, and physical therapy. (Id.). Renewal of Campbell's medications was delayed, and on December 1, 2018, Akintonde Oluwabunmi, Pharm.D. issued a "pain management consult." (Id. at 41). Oluwabunmi acknowledged that Campbell had CMT and noted that Campbell "has a history of several trials of alternative pain medications such as: Amitriptyline, Baclofen, Carbamezepine, Methocarbamol, and Lyrica." (Id.). Oluwabunmi also noted that Campbell had declined trying Cymbalta, Effexor, Tylenol ES, and NSAIDS. (Id.). Based on the review of Campbell's history, current test results, and his condition, Oluwabunmi recommended ordering an HgbA1c test, noting that Campbell's last HgbA1c reading occurred in 2013; starting Campbell on Meloxicam 7.5 mg bid; reducing the Gabapentin dosage to 1200 mg three times per day; repeating a test for Gabapentin levels in January 2019; and referring Campbell to an interdisciplinary pain management clinic for discussion of the treatment plan. (Id. at 42). Oluwabunmi also recommended that Campbell's Tramadol be tapered to 100 mg twice a day followed by a 10 to 25% weekly taper because, in her view, "[l]ong-

term opiate use can increase pain and there are no studies supporting the use of long term

opioids for chronic, noncancerous pain." (Id.).

On January 16, 2019, Miller saw Campbell for a sick call visit. (Id. at 43). Campbell

discussed his need for a long-handled toothbrush with Miller and explained that custody

staff told him that a new one would need to be provided by medical staff. (Id.). Campbell

also brought up the change in his medication and complained that he had been without

Tramadol for "a good while." (Id.). Miller explained that the clinical pharmacist had

recommended tapering with discontinuation of Tramadol, decrease of Neurontin dose, and

beginning Meloxicam. (Id.). Miller noted that Campbell had simply stopped receiving

Tramadol, rather than receiving a tapering dose as recommended. (Id.). Miller therefore

ordered the medications, including the tapering dose of Tramadol, and also ordered lab

tests, including one for A1c and Neurontin levels, as requested by the clinical pharmacist.

(Id.). Miller also put in a consult request for Campbell to receive the custom orthotics he

was measured for at Ability. (Id. at 49).

On March 8, 2019, Melissa M. Boch, R.N. was dispatched to Campbell's housing

unit because Campbell had fallen. (Id. at 50). When she arrived, she found Campbell lying

on his back on the floor. (Id.). Campbell explained that his fall was caused by the four-

year-old braces he was using. (Id.). Boch examined Campbell and, other than his complaint

of pain under his right knee, found him to be uninjured by the fall. (Id.).

On March 31, 2019, Campbell met with Clark and discussed several pending care

concerns. (Id. at 53). Clark put in a request for Campbell to be seen by Getachew within

the week "if possible." (Id.). Clark listed the following "[p]ending care concerns" in the

patient record: Campbell's leg braces "are causing open areas on lateral ankles" and do not help with his foot drop, causing Campbell to fall more frequently;[8] EMG test results from BSH had not been received; and Elavil, a medication recommended by Bajaj, was making Campbell "too drowsy." (Id.). Clark also generated consultation requests for an in-person neurology consultation at BSH and for physical therapy to assist Campbell with gait training and strengthening, as well as for suggestions regarding assistance for brushing his teeth. (Id.).

Pursuant to Clark's request, Getachew saw Campbell on April 8, 2019, via telemedicine. (Id. at 59). A nurse, Lori Keister, assisted with the physical examination. (Id.). Getachew noted that Campbell was in a wheelchair, he could not walk, and his condition was deteriorating. (Id.). Campbell had "atrophy of the upper and lower extremities" and complained of "severe pain with tingling sensation particularly at night." (Id.). Getachew further noted during the exam that Campbell exhibited an absence of reflexes in both upper and lower extremities as well as "pressure ulcers" from his daily wheelchair use. (Id.). The "Nursing Comments" in the record indicate that the "[p]rovider will consult with pharmacy provider for possible ultram renewal." (Id.). Getachew also submitted a consultation request for Campbell to visit Bajaj for a neurology follow-up. (Id. at 60).

On April 11, 2019, Campbell was evaluated by Physical Therapist Stephen D. Ryan, who noted that Campbell could walk with a cane independently for 50 feet and used a

_____

[8] Clark noted Miller's January 16, 2019 request for a consult, but added that she did not know if a decision had been made regarding that request.

wheelchair for "community distances." (Id. at 64). The stated goal for the eight sessions of therapy included increasing Campbell's knee and hip strength and establishing a self-maintenance program. (Id.). Campbell attended physical therapy sessions during April and May 2019. (Id. at 61–73).

Campbell returned to BSH to see Bajaj on May 22, 2019. (Id. at 74). Bajaj noted that Campbell was "losing his muscles in both feet and both hands" and that his symptoms were worsening. (Id.). Bajaj told Campbell that the only treatment for his condition was to treat the symptoms, and recommended continuing his prescriptions for Tramadol 50 mg twice daily and Neurontin 600 mg twice daily, along with continuing his physical therapy. (Id.). Bajaj also noted that Campbell needed a personal wheelchair because he could not walk or stand. (Id.). Bajaj stated, "[h]is muscles are getting wasted every year more and more, so he needs a personal wheelchair, that is what he wants to get." (Id.). Following this appointment, Campbell's Tramadol prescription was reinstated with Getachew's approval. (Id. at 76–77).

On June 15, 2019, Campbell complained to McLaughlin that he had not received his leg braces, the increased pain medication, or his personal wheelchair. (Id. at 81). McLaughlin was responsive to Campbell's complaints, notifying the medical records department that Bajaj's report was not in Campbell's record and resubmitting the consult request for Campbell's leg braces. (Id.). At the appointment, McLaughlin clipped Campbell's toenails because he was unable to do so himself due to the atrophy in his hands. (Id.). On June 24, 2019, when McLaughlin reviewed the neurology consult, she verified

that Bajaj recommended Campbell be given a personal wheelchair to use and put in an order for the wheelchair as well as a single cell. (Id. at 86).

On July 22, 2019, Campbell complained to Sue Brant, R.N. that he still had not received his leg braces, he was losing his sense of smell, and he had a "lesion on the top of his head that a provider biopsied." (Id. at 88). Campbell was referred to a provider for evaluation of the loss of his sense of smell. (Id.).

On July 24, 2019, Campbell was admitted to the infirmary because "he rolled his ankle in his cell." (Id. at 90). He had not received his new leg braces at that time. (Id.). Glass noted that Campbell was being "set up with his own [wheelchair] and handicap cell." (Id.). Getachew states that the order for a personal wheelchair was placed in June 2019 and "followed up again in October 2019." (Getachew Decl. ¶ 10). To date, there is no evidence in the record as to whether Campbell has received a personal wheelchair.

On August 15, 2019, Campbell returned to Ability to receive his custom fit orthotics. (Med. Recs. at 91). Getachew explains that the delay in Campbell receiving his custom orthotics was due to scheduling delays with which Getachew was not involved. (Getachew Decl. ¶ 7). Getachew admits, however, that the standard orthotics provided to Campbell proved to be ineffective "[a]fter a few months" of his receipt of the braces in October 2018 and that Campbell has "significant muscle atrophy of his upper and lower extremities" with bilateral foot drop. (Id. ¶ 6). Despite those factors, Getachew maintains that "deferring the custom AFOs to see if standard stock braces would be effective was an appropriate decision given the cost differential." (Id.). Getachew does not state what the cost difference is between the standard braces and custom fit braces. (Id.).

13

On August 23, 2019, Campbell was seen by neurologist Dr. Bernard McQuillan, who renewed Campbell's prescriptions for Neurontin and Tramadol. (Med. Recs. at 92–94). The request for those medications was approved by Getachew. (Id. at 94). Getachew explains that Campbell's Tramadol was discontinued based on the clinical pharmacist's recommendation. (Getachew Decl. ¶ 9). For his part, Getachew agrees that Tramadol is not recommended for "long term use for chronic non-cancerous pain." (Id.). However, Getachew also notes that the considerations raised by the clinical pharmacist "must be balanced with [Campbell's] condition of pain that he reports is worsening and reports is not effectively treated with other medications." (Id.). After consulting with the clinical pharmacist about restarting Tramadol and having Campbell evaluated again by Bajaj, who also recommended restarting Tramadol at 50 mg BID, Campbell was prescribed Tramadol again in June 2019. (Id.).

## II.   DISCUSSION

### A.   **Non-Dispositive Motions**

Getachew has filed several Motions to Strike on the grounds that Campbell's filings constitute impermissible amendments to his Complaint. Pursuant to Federal Rule of Civil Procedure 15(a), "[a] party may amend its pleading once as a matter of course within 21 days after serving it, or if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed.R.Civ.P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed.R.Civ.P. 15(a)(2). Rule 15 dictates that "[t]he court should freely give leave

when justice so requires." Id. Where the proposed amendment to the complaint appears to be a futility, this Court has the discretion to deny leave to amend. Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards: "[A] district court may deny leave if amending the complaint would be futile—that is, if the proposed amended complaint fails to satisfy the requirements of the federal rules." Katyle v. Penn Nat. Gaming, Inc. 637 F.3d 462, 471 (4th Cir. 2011) (citing U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 376 (4th Cir. 2008)).

The Court may also deny leave to amend where the proposed amendment "would be prejudicial to the opposing party, or the moving party has acted in bad faith[.]" Equal Rights Ctr. v. Niles Bolton Assoc., 602 F.3d 597, 603 (4th Cir. 2010). A proposed amendment is prejudicial to the opposing party if it is belated and would change the nature of the litigation. Id. at 604; see also Deasy v. Hill, 833 F.2d 38, 42 (4th Cir. 1987). Additionally, the Court may not address new claims raised in opposition to a dispositive motion, because it is not a vehicle for amending the complaint. See Whitten v. Healthcare Grp., Inc., No. PWG-14-3193, 2015 WL 2227928, at *7 (D.Md. May 11, 2015).

In addition to the allegations in his Complaint, Campbell outlines additional claims and putative Defendants in his Opposition to Defendants' Motion to Dismiss. (Pl.'s Resp. Defs.' Mot. Dismiss ["Pl.'s 2d Opp'n"], ECF No. 35). Specifically, Campbell states that a review of the records attached to Defendants' Motions reveals new people he believes are responsible for his substandard medical care. (Id. at 2). As such, Campbell seeks to add Mary Miller, N.P., Akintonde D. Oluwabunmi, Pharm.D., Bernard McQuillan, M.D., and

Corizon Health as Defendants. (Id.). His claim against Oluwabunmi is that she improperly terminated his Tramadol prescription despite a specialist, Bajaj, recommending he remain on the drug. (Id. at 6–7). His claim against Miller is that she was the first person he told he was losing his sense of smell and she did not refer him to a specialist for the problem; she is also the provider that informed him the prison's collegial review process had not approved his custom AFOs. (Id. at 7–8).[9]

Getachew moved to strike these proposed amendments on December 9, 2019. (ECF No. 38). Getachew argues that these amendments are prejudicial in that they seek to change the nature of the claims asserted and add parties who have not been served. The Court agrees. Moreover, Campbell's attempt to amend his Complaint through his Opposition is improper. See Whitten, 2015 WL 2227928, at *7. For these reasons, Campbell's proposed amendments will be denied.

On December 10, 2019, thirty-six days after Defendants filed their Motion to Dismiss, Campbell filed an Amended Complaint without seeking leave from the Court. (ECF No. 39). The Amended Complaint seeks to add Beverly McLaughlin, R.N.P. as a Defendant because "she was the main person [he] started to get seen by when [he] first started asking to get a personal wheelchair" and to amend the amount of damages he seeks to $800,000. (Am. Compl. at 1–2, ECF No. 39). Campbell seemingly blames McLaughlin for the four-year delay in receiving a wheelchair because she is the one who put in a request for a wheelchair on June 15, 2019; an ARP he filed regarding the wheelchair was found

---

[9] Campbell raises similar claims in his December 2, 2019 correspondence, which he filed four days before submitting his Motion for Summary Judgment. (ECF No. 36).

"meritorious"; and because he suffered a few falls in his cell due to not having the wheelchair. (Id.). Campbell's claims are futile, however, because they are asserted against a medical provider who in large part attempted to resolve the delay in providing Campbell with a wheelchair and leg braces. Accordingly, the Court will strike Campbell's Amended Complaint from the record.

Campbell twice supplemented his Complaint before Defendants responded. (ECF Nos. 3, 8). However, after Defendants' filed their dispositive motions, Campbell filed two additional Supplements to his Complaint on May 27, 2020 and July 7, 2020. (ECF Nos. 48, 53). Getachew moved to strike these additional Supplements on June 2, 2020 and July 27, 2020, respectively. (ECF Nos. 49, 54). Getachew asserts that the Supplements contain new allegations that Getachew examined Campbell's skin lesion and facilitated a dermatology consultation. According to Getachew, these allegations are outside Campbell's original Complaint and therefore were not addressed in the dispositive motions. The Court agrees. Claims regarding Campbell's skin lesion, which were not a part of Campbell's original Complaint or his first two Supplements, would belatedly change the nature of his claims. See Equal Rights Ctr., 602 F.3d at 603. Furthermore, Campbell may not attempt to add claims during the summary judgment phase of this case. See Sensormatic Sec.Corp. v. Sensormatic Elecs. Corp., 455 F.Supp.2d 399, 436 (D.Md. 2006) (liberal pleading standard "does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage"). Accordingly, the Court will strike Campbell's May 27, 2020 and July 7, 2020 Supplements.

Finally, Getachew has also moved to strike what he argues is an unauthorized surreply to Defendants' Motion to Dismiss. No party is entitled to file a surreply unless otherwise ordered by the Court. See Local Rule 105.2(a) (D.Md. 2018). A surreply is most often permitted when the moving party must respond to matters raised for the first time in a reply. See Lewis v. Rumsfeld, 154 F.Supp.2d 56, 61 (D.D.C. 2001).

As sometimes occurs in pro se matters, the motion practice in this case has not been a model of clarity. Two separate Motions to Dismiss were filed in this case—the first on November 4, 2019 by all Defendants, and the second on November 11, 2019 on behalf of Getachew only. (See ECF Nos. 29, 31). Campbell filed an untitled Opposition on November 20, 2019 (the "First Opposition"), which he indicated was a "response to Doctor Getachew [sic] motion to dismiss." (Pl.'s Resp. Mot. Dismiss ["Pl.'s 1st Opp'n"] at 1, ECF No. 33). Six days later, Getachew filed a Reply in which he apparently recognized that Campbell was responding to his Motion. (ECF No. 34). That same day, Campbell filed another untitled Opposition (the "Second Opposition") in which he noted it was his "response to the defendants [sic] answer to my complaints." (Pl.'s 2d Opp'n at 1).

Defendants assert that Campbell's First Opposition was incorrectly docketed as a response to Getachew's individual Motion to Dismiss, citing as evidence that Campbell referenced information contained in the Defendants' Motion to Dismiss. Thus, according to Defendants, both of his Oppositions responded to the same Motion, making his Second Opposition an unauthorized surreply. The Court is not convinced. While Campbell's pleadings could be clearer, the initial sentences of both Oppositions appear to indicate that Campbell intended to respond to the two Motions separately. Indeed, the Court sent

18

Campbell two separate Rule 12/56 Notices, thereby notifying him twice of his ability to respond. (See ECF Nos. 30, 32). Moreover, the fact that his Second Opposition was filed on the same day as Getachew's Reply—and the fact that Getachew himself initially viewed Campbell's First Opposition as a response to his Motion—further undermines the conclusion that Campbell's Second Opposition constituted an unauthorized surreply. For these reasons, the Court declines to strike Campbell's Second Opposition.

**B.    <u>Defendants' Dispositive Motions</u>**

**1.    Conversion**

Defendants' Motions are styled as motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. (See ECF Nos. 29, 31). Motions styled in this manner implicate the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).

"The Fourth Circuit places 'great weight' on the affidavit requirement." Nautilus Ins. Co. v. REMAC Am., Inc., 956 F.Supp.2d 674, 683 (D.Md. 2013) (quoting Evans, 80 F.3d at 961). However, non-compliance may be excused "if the nonmoving party has

adequately informed the district court that the motion is premature and that more discovery is necessary." Harrods, 302 F.3d at 244. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." Id. (quoting 10B Wright, Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

Nonetheless, a Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995)).

In this case, pursuant to the dictates of Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the Court notified Campbell of his right to respond to Defendants' Motions and advised that he may file affidavits, declarations, and exhibits along with his responses. (See ECF Nos. 30, 32). Campbell attached several exhibits to both of his Oppositions, (see ECF Nos. 33-1, 35-1), but did not submit a Rule 56(d) affidavit expressing a need for discovery. The only additional discovery Campbell has sought consists of his dental records. (ECF No. 44).[10] At bottom, this lone request is insufficient to show that conversion of

---

[10] As set forth below, the Court will deny Defendants' Motion for Summary Judgment as to Campbell's allegations relating to his long-handled toothbrush and related

Defendants' Motions is inappropriate. Accordingly, the Court will construe Defendants' Motions as motions for summary judgment and will consider documents outside of Campbell's Complaint and Supplements.

## 2. Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

---

dental issues. The Court does not need Campbell's dental records at this juncture in order to find that a genuine dispute of material fact exists on the issue of his dental health. Campbell will have the opportunity to request his dental records during discovery. Accordingly, Campbell's Motion for Dental Records (ECF No. 44) will be denied without prejudice.

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

### 3.      Analysis

Campbell's allegations regarding his medical care are most accurately construed as claims that Defendants were deliberately indifferent to Campbell's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976); see also Hope v. Pelzer, 536 U.S. 730, 737 (2002); Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." De'Lonta v. Angelone, 330 F.3d 630, 633 (4th Cir. 2003) (citing Wilson v. Seiter, 501 U.S. 294, 297 (1991)); accord Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017). To prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Anderson, 877 F.3d at 543. A prisoner plaintiff must allege and provide some evidence he was suffering from a serious medical need and that defendants were aware of his need for medical attention but failed to either provide it or ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503 U.S. 1, 8 (1992) ("[C]ourts considering a prisoner's claim must ask both if 'the officials act[ed] with a sufficiently culpable state of mind' and if the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." (quoting Wilson v. Seiter, 501 U.S. 294, 298, 303 (1991))); Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). A serious medical condition is an illness or condition that is either life-threatening or causes an unnecessary infliction of pain when it is not treated properly. See, e.g., Barnes v. Bilak, No. JKB-17-1057, 2018 WL 2289232, at *6 (D.Md. May 17, 2018) (finding that high blood pressure is a serious medical need); Johnson v. Quinones 145 F.3d 164, 168 (4th Cir. 1998) (finding that pituitary tumor is a serious medical need); Brown v. Harris, 240 F.3d 383, 389 (4th Cir. 2001) (finding that risk of suicide is a serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because 'prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends

to establish the defendants knew about the problem. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Scinto v. Stansberry, 841 F.3d 219, 226 (4th Cir. 2016) (quoting Farmer, 511 U.S. at 842).

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. See Lightsey, 775 F.3d at 179 (physician's act of prescribing treatment raises inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Additionally, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011) (quoting Bowring v. Godwin, 551 F.2d 44, 47–48 (4th Cir. 1977)).

Campbell's Eighth Amendment claims can be broken up as follows: (1) Defendants failed to timely replace Campbell's custom orthotics; (2) Defendants failed to timely provide Campbell a wheelchair; (3) Defendants failed to provide Campbell with a reasonable amount of pain medication; and (4) Defendants failed to provide Campbell with a long-handled toothbrush or other method to care for his dental health. The Court addresses each claim in turn.

26

### a.    Defendant Janette Clark

As Defendants note, the only time Clark is referenced in Campbell's Complaint or his surviving Supplements is to note that she prescribed him a long-handled toothbrush and told him that his AFO consult had been approved. Campbell also references Clark in his Oppositions, but only to reiterate her role in attempting to get him a long-handled toothbrush and to say that Clark had identified Brenda Reese as the person stopping him from getting a long-handled toothbrush. (Pl.'s First Resp. at 6; Pl.'s First Resp Compiled Exhibits at 33; Pl.'s Second Resp. at 9–11, 17).

Not only does Campbell fail to articulate Clark's role in his alleged mistreatment, a review of the record reflects that Clark appeared to be actively working to provide Campbell with the relief he sought. For example, in March 2019, Clark put in an urgent request for Campbell to be seen "this week if possible" for a long list of "[p]ending care concerns," including that his deficient leg braces were causing him to fall, delays in test results, and issues with his pain medication. (Med. Recs. at 53) That same meeting, Clark generated a consultation request for an in-person neurology consultation, for physical therapy, and for suggestions regarding assistance for brushing his teeth. (Id.). In October 2019, Clark "[c]ontinued to recommend long han [sic] tooth brush and will also now request foam tubing/grip handle that can be used with tooth brush and utensils." (Id. at 97). In that same meeting, after Campbell expressed concerns that his pain medication was insufficient to address his chronic pain, Clark "request[ed] a patient care conference" to determine the best path forward. (Id.).

27

At bottom, there is nothing in Campbell's Complaint, the Supplements thereto, or the undisputed evidence in the record alleging or otherwise indicating that Clark exhibited a deliberate indifference to Campbell's serious medical need. Accordingly, this Court will grant Defendants' Motion for Summary Judgment as it pertains to Clark.

### b.   Ankle Foot Orthotics

The undisputed facts establish that Campbell's condition requires use of orthotics. Campbell was measured and fitted for custom orthotics on August 21, 2018. During that consultation, the technician noted that Campbell's legs were so thin that standardized, pre-fabricated orthotics were unlikely to fit him properly. Prior to this appointment, Campbell states that he was provided with custom orthotics which were worn out. Despite the assessment by a specialist, the custom orthotics were "deferred" due to the cost. (Getachew Decl. ¶ 6).

Declining to provide medical treatment on the basis of cost is not by itself a sufficient basis for finding an Eighth Amendment claim. See Clawson, 650 F.3d at 538 (noting that right to treatment is limited to what can be provided at a reasonable cost). However, "a '[f]ailure to provide the level of care that a treating physician himself believes is necessary' may constitute deliberate indifference." Jackson, 775 F.3d at 179 (finding that a physician's act of prescribing treatment raises inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk) (quoting Miltier v. Beorn, 896 F.2d 848, 853 (4th Cir. 1990)). Here, Getachew admits the prefabricated orthotics given to Campbell proved ineffective, and there was no dispute that Campbell required orthotics (Getachew Decl. at ¶ 6). Campbell was nevertheless denied the proper

28

orthotics for a period of approximately 10 months. (Med. Recs. at 91). During that delay, Campbell fell at least twice and injured his foot and his finger, the latter of which he states has not been x-rayed. (Second Compl. Supp. at 2).

Whether Getachew had a duty to take more definitive action to obtain properly fitting orthotics, particularly in light of Campbell's continued falls, is a genuine dispute of material fact precluding summary judgment. Further, whether the decision to defer custom orthotics was due to a corporate policy or procedure without regard to Campbell's serious medical need is a genuine dispute of material fact precluding summary judgment in favor of Wexford. As such, Defendants are not entitled to summary judgment on this claim.

### c.      **Wheelchair**

It is also undisputed that Campbell should be prescribed a wheelchair for his medical condition. (See Med. Recs. at 74; Getachew Decl. ¶ 10). There is no evidence in the record to indicate that Campbell has been provided with a personal wheelchair, despite his medical care providers repeatedly acknowledging his need for one. The cause of the delay and the steps taken to address this failure are unclear. Summary judgment will therefore be denied on this claim.

### d.      **Pain medications**

Getachew, as well as the neurologists who have examined Campbell, acknowledge that Campbell's condition is incurable, worsening, and causes pain. (See Med. Recs. at 2; Getachew Decl. ¶ 9). Campbell's pain medications have not been terminated; rather, he has been placed on other medications for the purpose of ensuring that he does not suffer adverse consequences of long-term use of Tramadol. (Med. Recs. at 41; Getachew Decl. ¶ 9). That

decision does not evidence a callous disregard for Campbell's serious medical need. "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (citing Gittlemacker v. Prasse, 428 F.2d 1, 6 (3d Cir. 1970)); accord Jackson, 775 F.3d at 178 ("[W]e consistently have found such disagreements to fall short of showing deliberate indifference."). Thus, Defendants are entitled to summary judgment on this claim.

### e.   Long-handled toothbrush

Campbell alleges he lacks the manual dexterity to hold a regular toothbrush and claims the failure to provide him with another long-handled toothbrush has caused him to develop cavities. Hygiene needs such as the ability to brush one's own teeth are a serious medical need. See Flanory v. Bonn, 604 F.3d 249, 253–54 (6th Cir. 2010) (recognizing dental needs as falling into the category of serious medical needs where dental hygiene supplies were denied and led to gum disease); Board v. Farnham, 394 F.3d 469, 481–82 (7th Cir. 2005) (denying qualified immunity to prison officials who denied inmates toothpaste for three and a half weeks); Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (finding that lack of dental care causing pain, deterioration of teeth and inability to engage in normal activities states claim).

Here, there is recognition from Campbell's medical providers that his deteriorating physical condition requires the use of an assistive device to brush his teeth. Campbell avers that he has developed cavities as a result of being denied this device. The failure to provide Campbell with this assistive device appears to be the result of a conflict between medical

care providers and security staff. (<u>See</u> Getachew Decl. ¶ 8). While Getachew states there is a plan for Campbell's providers to meet to determine what can be done to accommodate this particular need, there is no evidence that the plan has been developed or is currently in place. (<u>Id.</u>). Thus, at this stage, there is a genuine dispute of material fact as to whether Defendants have adequately addressed Campbell's serious medical needs. Accordingly, Defendants are not entitled to summary judgment on this claim.

**C.**    <u>**Campbell's Motions for Summary Judgment**</u>

Campbell has filed two Motions for Summary Judgment. (ECF Nos. 37, 52). In Campbell's first Motion for Summary Judgment, he summarizes the allegations contained in his Complaint and Supplements and apparently seeks to add several additional allegations and new defendants. As set forth above, dispositive motions are not the appropriate vehicle for amending a complaint. <u>See</u> <u>Sensormatic</u>, 455 F.Supp.2d at 436; <u>Whitten</u>, 2015 WL 2227928, at *7. With respect to the broader Motion, drawing all justifiable inferences in Defendants' favor, Campbell's bare allegations do not establish that he is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); <u>Anderson</u>, 477 U.S. at 255. As a result, the Court will deny Campbell's first Motion for Summary Judgment (ECF No. 37).

In Campbell's second Motion for Summary Judgment, he raises new allegations regarding Defendants' alleged delay in fully excising a mole initially biopsied in 2013. (Pl.'s Mot. Summ. J. at 1, 3, ECF No. 52). However, he attaches a report to his Motion dated June 2, 2020, stating in part that a repeat biopsy of the mole should be considered "if the process were to significantly grow or change in appearance." (<u>Id.</u> at 7). Thus, his

assertion that Defendants denied him recommended surgery is disputed by the evidence enclosed with his own Motion. Campbell's second Motion for Summary Judgment (ECF No. 52) will therefore be denied.

## III.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 29) and Getachew's Motion to Dismiss or, Alternatively, for Summary Judgment (ECF No. 31) will be granted in part and denied in part. A separate Order follows.

Entered this 25th day of September, 2020.


_____/s/_____
George L. Russell, III
United States District Judge